J-S11033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.R.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.S., FATHER | : | |
| | : | No. 1224 WDA 2021 |

Appeal from the Decree Entered September 16, 2021
In the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): 32A-2021 O.C.

| | | |
|---|---|---|
| IN RE: J.D.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.S., FATHER | : | |
| | : | No. 1226 WDA 2021 |

Appeal from the Decree Entered September 16, 2021
In the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): 33A-2021 O.C.

BEFORE:  PANELLA, P.J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                 **FILED:  June 29, 2022**

J.S. ("Father") appeals from the decrees granting the petitions filed by the Jefferson County Children & Youth Services ("CYS" or the "Agency") to involuntarily terminate his parental rights to his daughter, J.R.S., born in December 2003, and son, J.D.S., born in July 2007 (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), (11), and (b).  We affirm.

This Court previously set forth the factual and procedural background of this case as follows:

As a matter of background, [CYS] has been involved with this family since 2017. On July 13, 2017, CYS filed dependency petitions and alleged that the Children were without proper parental care or control. [*See*] 42 Pa.C.S.[A.] § 6302(1). Specifically, CYS received a report that indicated that the Children were physically fighting with one another, throwing things, and not listening to Mother. Mother stated several times to a service provider that she could not handle the Children any longer and she wanted them out of her home. On August 30, 2017, the trial court held a hearing on the dependency petitions. In orders dated August 30, 2017, and entered on September 6, 2017, the trial court adjudicated the Children dependent. The orders directed that the Children remain in their separate foster care placements. On June 27, 2018, the trial court ordered termination of court supervision, and reunified the Children with Mother and Father. However, CYS continued to receive multiple referrals regarding the family.

On November 10, 2019, CYS received a report that J.[R.]S. returned home from the Meadows Psychiatric Center and resumed her previous behaviors of screaming, not listening, and refusing to follow instructions. Mother and J.[R.]S. engaged in a verbal altercation that prompted the caseworker to call the police. On November 12, 2019, the trial court granted CYS emergency protective custody of J.[R.]S., and she was placed in foster care. On December 5, 2019, J.[R.]S. was placed in a Group Home at Pathways Adolescent Center because her foster care placement was not able to manage [her] behaviors. Mother and Father eventually ended their tumultuous relationship, and J.D.S. remained in Father's home. On July 24, 2020, J.[R.]S. moved to a Group Home at Bethesda Lutheran Services because her previous placement did not believe that J.[R.]S. would make any more progress with them. On September 17, 2020, J.[R.]S. moved to a Residential Treatment Facility at Perseus House-Andromeda House for her to receive the mental health services she requires.

On or about July 31, 2020, the trial court granted CYS emergency custody of J.D.S. due to lack of parental care and control in Father's home. [*See*] N.T., 9/23/20, at 5. At that time,

Mother was incarcerated because she violated a [Protection From Abuse ("PFA")] order that Father filed against her. *Id*. at 20[,] 25. [Mother remained incarcerated until October 2020.] J.D.S. was placed in the same foster care home where he previously resided. On August 4, 2020, the trial court adjudicated J.D.S. dependent. On September 2, 2020, the trial court entered a no-contact order between Father and CYS because Father was continuously verbally abusive, harassing, and behaved inappropriately to all personnel assigned to assist the family in the home.

The trial court held an adjudication hearing on September 23, 2020. Rebecca Sallack, a caseworker for CYS, testified that the underlying basis for emergency custody of J.D.S. was due to the "continuous trauma that this child has dealt with over the course of his life." *Id*. at 29. More specifically, she testified that Father constantly "badmouthed" and made "inappropriate comments" about Mother, in front of J.D.S., to the home health nurse, to CYS and to service providers. *Id*. at 7. Ms. Sallack stated that Father was argumentative when asked if pest management could perform an evaluation after reports of a bed bug infestation of the home. *Id*. at 8. Ms. Sallack explained that Father "fought" CYS until "after multiple attempts he eventually gave in and said, Whatever, with an attitude, to have the home looked at . . .. [W]hen pest management did the evaluation, they found bed bugs in the home. [Father] then stated that [CYS] asked pest management to say there was [*sic*] bed bugs in the home." *Id*. Father was also argumentative regarding counseling for J.D.S. *Id*. at 9. Ms. Sallack stated that multiple service providers indicated that Father behaved inappropriately, was aggressive, and made them feel uncomfortable. *Id*. at 10-11. Ms. Sallack explained that Father was "constantly argumentative, belligerent, verbally aggressive, takes very little responsibility for his part of the kids being removed, [and] blames [Mother] for the majority of the issues." *Id*. at 12. Ms. Sallack recounted an incident where Father choked J.[R.]S. and admitted that he told J.[R.]S. "she will have to be a little [f------] whore to keep a roof over her head." *Id*. at 13-14.

With regard to Mother, Ms. Sallack testified that there was an extensive history of Mother's aggressive behavior towards Father and the Children. *Id*. at 27. Notably, Ms. Sallack testified that a no-contact order was put in place between J.[R.]S. and Mother because "the phone calls [between them] were getting

aggressive, and J.[R.]S.'s behaviors were increasing . . . she was fighting with peers, fighting with staff, threatening to harm herself, [and] threatening suicide." **Id**. at 17[,] 26. Ms. Sallack testified that chaos, noise, and arguments exacerbate symptoms of anxiety for J.[R.]S. **Id**. at 34. Ms. Sallack explained that J.[R.]S. should avoid conflicts and interactions with people who cannot manage their behaviors, and recommended a goal change for J.[R.]S. **Id**.

Ms. Sallack opined that the Children need a plan for permanency. **Id**. at 27. She explained, "[t]his has gone on entirely too long, and it's- - like I said, this is not something that's new. If you go back through the case record, and this fighting and this bickering and the police [being] called, this is years and years and years on these kids." **Id**. at 27.

On the record, at the conclusion of the September 23, 2020 hearing, the trial court stated it would change the Children's goals to adoption, and enter its orders on that same date. . . . Father and Mother filed timely notices of appeal . . ..

**In re J.S.**, 260 A.3d 102 (Pa. Super. 2021) (unpublished memorandum at **1-6). This Court affirmed the goal change orders. **See id**. (unpublished memorandum at *18).

Thereafter, the Agency filed petitions for the involuntary termination of Father's and Mother's parental rights to Children. The trial court conducted a hearing on September 2, 2021. Father participated via telephone from Florida, where he had relocated, and was represented by counsel. Mother was present and represented by counsel. Further, the Children were represented by a guardian *ad litem* and court-appointed legal counsel. During the hearing, the Agency presented the testimony of Ms. Sallack. Mother and Father each testified on their own behalf. The guardian *ad litem* and legal counsel for the

Children argued in favor of termination of parental rights. **See** N.T., 9/2/21, at 84-86.[1]

On September 16, 2021, the trial court entered decrees terminating Father's parental rights.[2] Father filed timely notices of appeal, as well as concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court *sua sponte* consolidated Father's appeals. The trial court complied with Rule 1925(a).[3]

Father raises the following issues for our review:

[1.] Whether the [t]rial [c]ourt made an error of law or abused its discretion in terminating [Father's] parental rights under 23 Pa C.S.[A. § 2511](a)(2)?

[2.] Whether the [t]rial [c]ourt made an error law or abused its discretion in terminating [Father's] parental rights under 23 Pa.C.S.A. [§ 2511](b)?

Father's Brief at 6.

_____

[1] Although the trial court incorporated the dependency records into the termination proceedings, **see** N.T., 9/2/21, at 56-57, those records are not included in the certified record. However, this omission does not impair our review. Additionally, the trial court admitted Exhibit CYS 1, which consists of documentation regarding Father's status as a registered sexual offender in Florida. **See id**. at 14. However, this exhibit is not included in the certified record. Nevertheless, given Father's admission that he is a registered sexual offender, the omission of the exhibit does not impair our review. **See id**. at 82.

[2] The trial court also involuntarily terminated Mother's parental rights to J.R.S. and J.D.S. Mother's appeals are pending at separate docket numbers, and we address her appeals in a separate memorandum.

[3] In lieu of authoring a Pa.R.A.P. 1925(a) opinion, the trial court relied on its September 16, 2021 opinion explaining the basis for its decrees.

Our standard of review of a decree involuntarily terminating parental rights is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted). "The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by section 2511 and requires the trial court to conduct a bifurcated analysis of the grounds for termination under subsection (a) followed by the consideration of the needs and welfare of the child under subsection (b). The initial focus is on the conduct of the parent. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). The party seeking termination must prove by clear and convincing evidence

that the parent's conduct satisfies one of the statutory grounds for termination delineated in section 2511(a). *Id*. Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b), relating to the needs and welfare of the child. *Id*. We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to sections 2511(a)(2), (5), (8), (11), and (b).[4] Where, as here, the trial court determines that there are grounds for termination under more than one subsection of section 2511(a), we need only agree with the trial court's determination as to any one subsection in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004). Given this latitude, we analyze the court's termination decrees pursuant to subsections (a)(2) and (b), which provide as follows:

_____

[4] Notably, Father has not raised any challenge related to the trial court's determinations under subsections 2511(5), (8), and (11) in either his concise statement or in his statement of questions presented. As such, Father has waived any claim of error related to these subsections. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (reiterating that issues not raised in the concise statement or in the statement of questions presented are waived). It follows that we may affirm the decrees on the basis of subsections 2511(5), (8), and (11).

- 7 -

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).[5]

_____

[5] We are mindful that, because J.R.S. is now eighteen years old, Father's appeal of the decree terminating his parental rights to J.R.S. may be moot. As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. *In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) (holding that an issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect). Although J.R.S. is no longer a child, this Court will decide questions

In Father's first issue, he challenges the trial court's determination that the Agency established grounds for termination under section 2511(a)(2). With regard to section 2511(a)(2), this Court has explained:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citations omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017) (citation omitted). As such, "[a] parent's vow to cooperate, after a long period of

_____

that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: (1) the case involves a question of great public importance; (2) the question presented is capable of repetition and apt to elude appellate review; or (3) a party to the controversy will suffer some detriment due to the decision of the trial court. *Id*. Here, Father will clearly suffer detriment as a result of the termination of his parental rights to J.R.S. Accordingly, we find the doctrine of mootness is overcome and continue with our analysis.

uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **In re S.C.**, 247 A.3d at 1105 (citation omitted).

With respect to section 2511(a)(2), Father argues that any incapacity or refusal resulting in a lack of parental care and control no longer exists. Father claims that marital and family discord was the essential concern in this matter and that it was not always deemed to be a challenge unable to be overcome. Further, he asserts that he has remedied the situation by obtaining a PFA order against Mother and relocating to Florida. Father maintains that "[b]y taking these actions, and putting a huge distance between himself and [Mother], . . . he has remedied the conditions and causes underlying any incapacity." Father's Brief at 8.

In finding grounds for termination of Father's parental rights pursuant to section 2511(a)(2), the trial court reasoned:

> [J.R.S.] was removed from her parents' care on November 10, 2019. [J.D.S.] followed on July 31, 2020. Neither parent was able to provide appropriate care and control in either instance. Both individually and as a couple, their lives were defined by anger and hostility. Unable to control even themselves, they were certainly incapable of controlling their children, who quite naturally absorbed and regurgitated the ugliness surrounding them.
>
> Since the beginning of the [C]hildren's dependency, Mother and Father have sought to blame one another for the conditions that led to their removal and prevented their return. . ..
>
> * * * *
>
> Like Mother, Father underwent extensive therapy in relation to the dependency proceedings, and the only thing it seemed to

teach him was which phrases and buzz words to use while trying to convince the [c]ourt that he was learning and making progress toward his treatment goals. In doggedly refusing to cooperate with CYS except on his own terms; in becoming so aggressive with Pathways' [staff] that he was cut off from further communication while [J.R.S.] resided there; and in engaging with Agency staff and third-party providers in such a manner as to warrant a comprehensive no-contact order, moreover, he proved that all the therapy and other services he had received made no difference whatsoever. If anything, he was worse at the end than he had been at the beginning. At the height of his abrasiveness, moreover, Mother was out of the house. More specifically, Mother was in jail. Unquestionably, then, even were the [c]ourt to entertain the idea that one competent adult can "make" another competent adult behave badly, it can say unequivocally that Mother bore no responsibility for Father's behavior after she was arrested for violating the temporary PFA order. There being no evidence that Father has rectified the conditions that led to [the C]hildren's removal and ultimately to the goal change, therefore, the [c]ourt wholly rejects the idea that he would be able to immediately care for the [C]hildren should they be remanded to his custody in Florida.

Additionally, Father did not articulate even a generic plan for how he might address his own deficiencies, reengage with [the Children], and thus arrive at the place where the here [*sic*] could safely be reunited as a family, and considering **his** dependency history, the [c]ourt is certainly unwilling to assume he would take any meaningful steps to make that happen should it decline to terminate his parental rights. Regardless of what he might be willing to do to alleviate the other issues that have kept him and [the C]hildren apart, moreover, Father cannot undo the fact that he is a convicted sex offender under a perpetual duty to register in his jurisdiction of residence.

Trial Court Opinion, 9/16/21, at 6-8 (footnotes omitted, emphasis in original).

Our review of the record supports the trial court's factual findings and credibility determinations underlying its decision to involuntarily terminate Father's parental rights under section 2511(a)(2). While Ms. Sallack testified that Father was initially compliant with the family service plan goals, she

subsequently indicated noncompliance and a lack of progress. *See* N.T., 9/2/21, at 20-21. Ms. Sallack described minimal compliance by Father at the time of the goal change in September 2020. *Id*. at 20. She similarly stated that, subsequent to the June 2020 review hearing, Father was not compliant with the child permanency plans. *Id*. at 27. She likewise noted no progress since July 2020, which continued after the goal change in September 2020. *Id*. at 39-40. Importantly, Ms. Sallack noted that services were stopped on September 2, 2020, because the Agency obtained a no-contact order as a result of Father's aggressive and inappropriate behavior, which continued even after Mother was no longer in Father's home. *Id*. at 31, 40, 43. For these reasons, Ms. Sallack explained that "[i]t is the [A]gency's position that the parental rights of . . . [Father] be terminated and the [C]hildren be free for adoption." *Id*. at 36.

As the record substantiates the trial court's finding under section 2511(a)(2) that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for his physical and mental well-being, and that Father cannot or will not remedy this situation, Father's first issue merits no relief.

We next determine whether termination was proper under section 2511(b). Where the grounds for termination under subsection 2511(a) are met, the trial court shall then give primary consideration to the developmental, physical and emotional needs and welfare of the child under subsection 2511(b). *See In re T.S.M.*, 71 A.3d at 267. The emotional needs

and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. *Id*. The determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. *Id*. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond. *Id*.

The evaluation of a child's bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the [s]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . ..

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

While a parent may profess to love the child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125 (citation omitted). Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Father challenges the trial court's finding that his bonds with the Children were not sufficient to warrant preservation and claims that the court failed to evaluate those bonds and to adequately weigh the effects of their severance. Father asserts that J.R.S. has significant emotional ties to her parents and was begging the trial court to permit her to return to them as late as June 2020. Father argues that the Agency never completed an updated bonding assessment, and instead relied on a 2017 assessment. According to Father, for reasons out of the parents' control, the assessments scheduled in 2020 were cancelled and rescheduled, but ultimately never completed. Father maintains that, unless his rights are reinstated, the Children will lose out on

the paternal support provided to date, and the opportunity to rebuild their relationship in a new environment away from the previous domestic problems.

The trial court determined that the involuntary termination of Father's parental rights was in the best interests of the Children's needs and welfare under section 2511(b). The trial court explained its findings, as follows:

> [J.D.S.] is in a good home with a family that has loved him and met his needs for two of the last three years. Physically and emotionally, his foster parents have engaged with him as though he were their own son and hope they will have the opportunity to do just that for the rest of their lives. Perpetually in conflict with his natural parents, [J.D.S.] has also responded well to his foster family and shown commendable progress, both academic and psychological, under their care. Fully reciprocating their love, he, too, wants his place in the family to become permanent—to have his foster parents adopt him and give him their last name.
>
> Without a prospective adoptive family, [J.R.S.]'s future is less certain. Odd though it may sound to someone unfamiliar with [her] family history, however, the [c]ourt concludes without hesitation that being a legal orphan will better serve the girl's interests than being forced to return to the destructive impact of one or both of her highly dysfunctional parents. Less equipped than her brother to process and outwardly manage the emotional turmoil that has accompanied her interactions with Mother and Father both before and after she was removed from their home, [J.R.S.] has only been able to achieve lasting stability since the [c]ourt severed all communication between them. All past attempts to reunify the family have resulted in [J.R.S.]'s regression, and whereas neither Father nor Mother has alleviated the internal conditions that led to the girl's removal in the first place, the [c]ourt has zero expectation that another attempt at this point will be successful. On the contrary, forcing [J.R.S.] back into a toxic relationship with either or both of them could prove even more harmful now, as she will soon be an adult without a statutory right to the stabilizing services available to her through CYS and the [c]ourt. While terminating Mother['s] and Father's parental rights may not achieve for [J.R.S.] the same happy ending available to [J.D.S.], therefore, it is no less what is in her best interests as she nears the age of majority and independence.

> Counterintuitive as it may seem, it is in her best interests to sever the parental bonds that have been nothing but distressing even though she does not now have another family waiting to adopt her.

Trial Court Opinion, 9/16/21, at 8-9.

Our review of the record supports the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to section 2511(b). Significantly, a no-contact order went into place in July 2020 and phone calls and visits with J.R.S. stopped due to their negative impact on her. *See* N.T., 9/2/21, at 21, 29-30, 39. Ms. Sallack described the situation as follows:

> So while [J.R.S.] was at Pathways Adolescent Center, [Mother] was going to visit [J.R.S.] on grounds. She was being taken up by family members to visit with [J.R.S.] [Father] was making phone calls. The phone calls and the visits were stopped on July 8, 2020, [and] that was when the no contact order went in . . . because Pathways had called and said that after phone calls and visits between the parents and [J.R.S.], there were major behavior issues. [J.R.S.] would fight with other students.
>
> [J.R.S.] would scream. [J.R.S.] was verbally aggressive. She would threaten to kill herself, and her mental health declined after those visits. And [Father] got verbally aggressive with the staff at Pathways. And Pathways had asked to not be able to have contact with him because they could not reason with him on the phone.

*Id*. at 29-30.

Further, while J.R.S. remained in a residential treatment facility at the time of the termination hearing, the Agency was exploring potential foster home placements. *Id*. at 35, 42. Ms. Sallack noted that J.R.S. reported that she is "ready to be with a family where she's loved and accepted." *Id*. at 50.

- 16 -

Acknowledging the stability J.R.S. had achieved, Ms. Sallack confirmed that not only had J.R.S. been in her current residential treatment facility placement for almost one year, but she had learned to manage stress and anxiety. *Id*. at 17, 19, 52-54. Ms. Sallack observed, "I had done a visit between [the Children] three weeks ago, and that interaction between [the Children] was talking about this day, talking about adoptions coming up, talking about [J.D.S.] changing his name and [J.R.S.] wanting to find a family where she could go and change her name as well." *Id*. at 50-51.

Moreover, J.D.S. was placed with a pre-adoptive foster family with whom he had resided for over a year at the time of the hearing, as well as almost a year when placed previously, and with whom he was bonded and doing well. *Id*. at 17, 35-36, 43, 49, 55. As such, he desired to be adopted and change his name. *Id*. at 36, 51. Ms. Sallack testified that "[J.D.S.] is happy where he is and ready to be adopted. . .." *Id*. at 51.

While Father may profess to love the Children, his feelings of love and affection for them will not preclude termination of his parental rights. *See In re Z.P.*, 994 A.2d at 1121. The Children are entitled to permanency and stability, and their lives cannot be put on hold in the hope that Father will one day summon the ability to handle the responsibilities of parenting. *Id*. at 1125. Accordingly, we conclude that the record supports the court's factual findings and credibility determinations that grounds existed for the termination of Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and

(b). As we discern no abuse of discretion by the trial court, we affirm the decrees involuntarily terminating Father's parental rights to J.R.S. and J.D.S.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/29/2022